IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 10, 2016 Session

## STATE OF TENNESSEE v. RICHARD BRYANT LONG

**Appeal from the Circuit Court for Lawrence County**
**No. 30905    Stella Hargrove, Judge**

_____

**No. M2015-02093-CCA-R3-CD – Filed August 25, 2016**

_____

A Lawrence County jury convicted the Defendant, Richard Bryant Long, of rape of a child, and the trial court sentenced him to serve twenty-five years in the Tennessee Department of Correction.  On appeal, the Defendant contends that the trial court erred when it allowed a video recording of the victim's interview to be admitted without satisfying the requirements of Tennessee Code Annotated section 24-7-123.  After a thorough review of the record and relevant authorities, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and TIMOTHY L. EASTER, JJ., joined.

John S. Colley, III, Columbia, Tennessee (on appeal) and Robert Stovall, Jr., Pulaski, Tennessee (at trial) for the appellant, Richard Bryant Long.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Senior Counsel; Brent A. Cooper, District Attorney General; and Christie L. Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Facts
### A.  Trial

This case arises from the Defendant's rape of his twelve-year-old step-daughter, the

victim, B.M.[1]  A Lawrence County grand jury indicted the Defendant for rape of a child, and at the Defendant's trial on this charge, the following evidence was presented: B.M. testified that she was twelve years old at the time of trial and that, at the time of the rape, the Defendant was married to her mother.  The Defendant came to live with her family when she was one year old, and she called him "daddy" after that.  She testified that, at the time of these events, she lived with her mother, the Defendant, her little sister, and her older brother.  B.M. stated that, when her little sister was born, the Defendant began coming into her room in the middle of the night and touching her "private areas, [her] chest areas, and [her] legs, and rub against [her]."  She stated that the Defendant took her to "the farm" and did "those things" in the middle of the night there too.  B.M. stated that the Defendant would "do it" a couple of times a week.

B.M. stated that, on Easter 2012, during a visit to Carlton Doss's farm, she and the Defendant loaded Doss's four-wheeler onto a trailer and drove it to a barn on Doss's property.  At the barn, the Defendant urinated while the victim stayed in the truck.  When he returned to the truck, his penis was protruding from his pants.  B.M. informed the Defendant of this fact, and the Defendant responded that he did not realize he was exposed.

B.M. said that, after learning that some cows were loose in the woods, the two drove the four-wheeler the woods.  The Defendant asked B.M. if she wanted to play a game.  The Defendant told her to close her eyes and open her mouth, and he "rubbed his pinky on the sides of [B.M.'s] mouth."  B.M. told the Defendant to stop and moved his hand.  The Defendant "rubbed his private areas around [B.M.'s] chest."  B.M. told the Defendant that she was going to tell her mother, and the Defendant "got mad."  He then took her to a creek or a pond and told her to remove her clothing and get into the water, offering to swim with her.  B.M. said that she wanted to go home and that the Defendant eventually took her home.

B.M. testified that her older brother had basketball practice on Mondays and Thursdays after school, and B.M. went home with the Defendant and her little sister.  At home, B.M. would sit on the couch, and the Defendant would sit down next to her and "put his hand on [her] lap and he would rub against [her] knees.  And sometimes he would pull against [her] clothes or tug on them.  And he would try to mess with [her] or touch [her] in [her] privates."  B.M. was "scared" to go home with the Defendant on the afternoons when her brother had basketball practice.

B.M. testified that she shared a room with her little sister but that, when she was younger, her little sister slept in another room.  During that time, the Defendant came into B.M.'s room at night and rubbed against her and laid his hand on her lap.  B.M. testified that

---

1 It is the policy of this Court to refer to minor victims by their initials only.

the Defendant rubbed her privates in the "front," her chest, and her "upper lap." The Defendant also "rubbed his private" with his hand, usually after he was finished "messing with" B.M. She testified that she could see his "private" and that "greenish-white goo" came out of it and onto his hand. B.M. told the Defendant that she was going to tell her mother, and the Defendant responded that he would hurt B.M. or put her in the hospital if she told her mother.

B.M. clarified that the Defendant touched her private area with his fingers on the "outside." He "tr[ied] to go inside" of her private area, but B.M. squeezed her legs tight to stop him. B.M. eventually told her mother and grandmother what the Defendant had been doing, and the police were contacted.

On cross-examination, B.M. agreed that she did not cry out for help to the other adults in the house when the Defendant touched her. She reiterated that the Defendant touched her in her room in the middle of the night a couple of times a week for five years. She stated that she saw the "goo" come out of the Defendant's privates one or two times and that one time it got on the side of her mouth. B.M. agreed that she had never liked the Defendant and did not want her mother to marry him. B.M. agreed that she had testified to several things she did not reveal in her forensic interview.

Nathan Neese testified that he was employed by the Lawrence County Sheriff's Office and that he became involved with this case on the day a forensic interview was conducted with B.M. Lieutenant Neese interviewed the Defendant. The Defendant denied B.M.'s allegations but said he sometimes wore boxer shorts around the house, that the shorts did not have a button in the crotch area, and that sometimes his penis came out.

B.M.'s mother testified that B.M. told her about the Defendant's actions and that she confronted him. He denied the allegations, and they fought over the issue. The next day, B.M.'s mother visited her own mother and sister, B.M.'s aunt, at her mother's house. B.M.'s aunt told B.M.'s mother that she would call the police about what B.M. had reported. B.M.'s mother stated that she believed B.M.'s allegations and that she had kept the Defendant away from B.M. ever since.

On cross-examination, B.M.'s mother agreed that she never heard B.M. call out to her for help in the middle of the night or had any idea that this was going on between the Defendant and B.M.

Dawn Bradley testified that she worked for the Department of Children's Services ("DCS") and that she interviewed B.M. B.M. told her that the Defendant had touched her "inappropriately." A forensic interviewer at a child advocacy center later interviewed B.M.

3

Law enforcement was alerted of the interview, which was video recorded.

During a jury-out hearing, the State advised the trial court of its intention to introduce the video recording of the forensic interview, on the basis that it was necessary to rebut what the victim's testimony on cross-examination about her conversation with the forensic interviewer. Defense counsel objected to the video, saying that its introduction was not necessary to rebut the few questions asked of the victim about what she told the forensic interviewer. The trial court concluded that defense counsel had opened the door for the introduction of the video because defense counsel asked the victim about her testimony that was inconsistent with what she told the forensic interviewer. The trial court further stated that the video was related to material issues in this case.

Still on the subject of the forensic interview, defense counsel argued that "the statute require[d] some qualifying things to be done" before the video was introduced. Both parties and the trial court referred to and read aloud Tennessee Code Annotated section 24-7-123, which governs the admissibility of a video interview with a child by a forensic interviewer regarding sexual contact. Defense counsel argued that there were "specific requirements . . . about the forensic examiner" including that the interviewer had to be licensed in a certain way. The forensic interviewer, Katie Brazier, then testified that she interviewed B.M. in 2012, when she was employed by Kid's Place, a child advocacy center. Ms. Brazier testified that Kid's Place was properly certified as a child advocacy center by the State of Tennessee at the time of the interview. Ms. Brazier stated that she had graduated from the University of North Alabama with a bachelor's degree in social work in 2005. After completing her degree, Ms. Brazier was employed by DCS for eight months and then was employed with Kid's Place for six and a half years, where she conducted forensic interviews. At the time of trial, Ms. Brazier had been employed by DCS for two years.

Ms. Brazier clarified that at the time of her interview with B.M., Ms. Brazier had six years of experience doing forensic interviews. Ms. Brazier testified about her forensic training, which consisted of forty hours of "basic forensic interview training," which she completed at the National Child Advocacy Center. Ms. Brazier did an internship during her training at Kid's Place, during which she "shadowed" a forensic interviewer. Ms. Brazier's curriculum vitae was admitted as an exhibit. The trial court found that Ms. Brazier met the qualifications and specific requirements found at Tennessee Code Annotated section 24-7-123(b)(3) and found specifically that Ms. Brazier had "completed the forensic training as required" and had "worked under a forensic interviewer, prior to becoming one herself." Defense counsel lodged a contemporaneous objection prior to the trial court's admission of the video, while acknowledging that the trial court had "satisfied all the requirements."

In the presence of the jury, Jill Howlett testified that she was employed at Our Kid's

Center in Nashville, an outpatient child advocacy clinic that conducted forensic medical examinations of children who had been sexually abused. Ms. Howlett interviewed B.M. for a medical history and about the alleged sexual encounters with the Defendant. B.M. reported to Ms. Howlett that the Defendant had touched her private area with his hands, both on her skin and over her clothes. She stated that he touched the inside and outside of her private area and that this happened more than one time. B.M. reported that she saw "gray nasty stuff" come out of the Defendant's penis when he was "giving [her] a shower."

Katie Brazier testified that she was employed by Kid's Place in 2012 and interviewed B.M. Ms. Brazier testified to her training and qualifications as a forensic interviewer, consistent with her testimony during the prior jury-out hearing. Ms. Brazier stated that she had also completed advanced forensic interview training. She stated that she had conducted over 2,000 interviews while employed at Kid's Place. At this point, the video recording of Ms. Brazier's forensic interview with B.M. was played for the jury.

On cross-examination, Ms. Brazier agreed that what B.M. had told her during the interview differed from what B.M. had testified to, in some aspects. Ms. Brazier recalled that B.M. told her she was scared to tell the doctor who examined her some of the things that had happened.

For the Defendant, Sandra Anderson, his mother, testified that she knew B.M. as her step-granddaughter. She said that B.M. had visited her home too many times to count and that she had visited B.M.'s home. She estimated that the two had been together "[h]undreds" of times. Ms. Anderson said that she had caught B.M. lying "so many times." B.M., she said, lied about her brother mainly but so often that Ms. Anderson would not believe anything that B.M. said. Ms. Anderson recalled that, after the Defendant moved out of the home, she went to bring pizza to B.M. and her mother. B.M. showed her a closet full of new clothing and told her that she received the clothing in exchange for her accusations against the Defendant.

During cross-examination, Ms. Anderson testified that she usually believed B.M.'s brother's recount of events over B.M.'s version. She described him as "mellow" and unlikely to start trouble.

John Anderson, the Defendant's stepfather, testified that he had helped to raise the Defendant since the Defendant was four years old. He said he knew B.M. through the Defendant and had seen her over 100 times. The last time he saw B.M. was after the Defendant and B.M.'s mother separated. Mr. Anderson testified that B.M. liked to "stretch the truth" and wanted to be the center of attention. Mr. Anderson described a conversation during which B.M. told him that B.M.'s mother and another man were colluding with her

5

biological father to "get rid" of the Defendant. Mr. Anderson said he was present at B.M.'s house on Easter 2012 from 10:30 a.m. until 4:00 p.m. He said the Defendant and B.M. never left the home alone.

During cross-examination, Mr. Anderson testified that he later learned that B.M.'s father was incarcerated. He said he was not surprised to learn that the B.M.'s father was not scheduled for parole until 2033. After this conversation, Mr. Anderson said he told the Defendant to "look for trouble."

Donna Howell, the Defendant's girlfriend, testified that the two had dated for three years as of the time of trial. Ms. Howell said that she had engaged in intercourse with the Defendant on numerous occasions and, on those occasions, she never noticed him to have green goo" coming from the end of his penis. She said that he had not given her any sexually transmitted diseases. Ms. Howell testified that the Defendant had been around her young niece and her nephew and they had no complaints about his behavior. During cross-examination, Ms. Howell testified that the Defendant did not live in a home with her niece or nephew.

Carl Doss testified that he employed the Defendant for a long period of time. He said that, Easter morning 2012, he went to church and came home for an Easter egg hunt. He said that he did not see the Defendant or B.M. at his home that day and that no one drove his four wheeler that day. During cross-examination, he agreed that he did not know what happened at his home while he was at church.

Based upon this evidence, the jury convicted the Defendant of rape of a child. The trial court sentenced the Defendant to twenty-five years to be served at 100%. It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that the trial court erred when it admitted into evidence the video recording of Ms. Brazier's forensic interview with B.M. He contends that Ms. Brazier's qualifications as a forensic interviewer did not satisfy the requirement of Tennessee Code Annotated section 24-7-123(b)(3)(E), that the forensic interviewer "[h]ad completed a minimum of eight (8) hours of interviewing under the supervision of a qualified forensic interviewer of children[.]" The Defendant argues that Ms. Brazier testified that she "shadowed" a forensic interviewer as part of an internship and that this is not sufficient compliance with the statute. The State counters first that the Defendant waived appellate review by failing to object to the admission of the video on this specific ground. The State contends that his objection to the video was on other grounds. It then asserts that Ms.

Brazier's testimony was sufficient to establish her qualifications in compliance with the statute and that, based on her testimony, the trial court did not abuse its discretion when it admitted the video into evidence. We agree with the State.

## A. Waiver

The State contends that the Defendant's argument on appeal has been waived because he failed to object to the video's introduction on the specific ground that the State failed to establish Ms. Brazier's compliance with section 24-7-123(b)(3)(E). The Defendant objected properly to the admission of the video at several points throughout the trial, but at no point did the Defendant raise a specific objection regarding Ms. Brazier's qualifications or whether she had completed the supervision and/or training required in section 24-7-123(b)(3)(E), and this basis for his objection was not apparent in the context of his general objections. After a hearing on Ms. Brazier's qualifications, the Defendant's counsel made a general objection to playing the video. However, because he never made a specific objection to Ms. Brazier's qualifications, we agree with the State that this argument is waived on appeal pursuant to Tennessee Rule of Evidence 103 (requiring an objection to the admission of evidence "stating the specific ground of objection if the specific ground was not apparent from the context").

## B. Plain Error Review

We may review issues normally considered waived pursuant to the plain error doctrine. Tenn. R. App. P. 36(b). The doctrine of plain error only applies when all five of the following factors have been established:

(1) the record clearly establishes what occurred in the trial court;

(2) the error breached a clear and unequivocal rule of law;

(3) the error adversely affected a substantial right of the complaining party;

(4) the error was not waived for tactical reasons; and

(5) substantial justice is at stake; that is, the error was so significant that it "probably changed the outcome of the trial."

*State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010) (quoting *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000)). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error."

*State v. Page*, 184 S.W.3d 223, 231 (Tenn. 2006). All five factors must be present for plain error review. *See State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000). It is the accused's burden to persuade an appellate court that the trial court committed plain error. *See United States v. Olano*, 507 U.S. 725, 734 (1993). Further, our complete consideration of all five of the factors is not necessary when it is clear from the record that at least one of them cannot be satisfied. *Smith*, 24 S.W.3d at 283.

The Defendant contends that Ms. Brazier's testimony did not show that her qualifications complied with the statutory requirements for forensic interviewers. During the jury-out hearing held on the admission of the video, Ms. Brazier testified as to her qualifications and training as a forensic interviewer, and the following exchange occurred:

> Prosecutor: All right. Did you complete at least an eight hour training with a – I guess, sort of an internship with someone who was qualified to do forensic interviews?
>
> Witness: I actually had an internship with Kid's Place, prior to being employed there, and I did shadow the Forensic Interview.

During direct-examination, Ms. Brazier testified that prior to her employment at Kid's Place, she observed the forensic interviewer there and "shadowed her," before being asked to conduct forensic interviews.

The trial court listed to Ms. Braizer's qualifications and found that she met the qualifications required by the statute The trial court determined that, pursuant to the other statutory requirements, the recording possessed particular guarantees of trustworthiness. It said that, while in the video the victim was younger and more nervous, she also appeared mature enough to respond to the questions and relate the events that occurred. The trial court found that the victim's statement was spontaneous and responsive to the interviewer's questions. It found that there was extrinsic evidence to suggest that the Defendant had the opportunity to commit the acts at the victim's house and the farm. The trial court determined that the State had fulfilled the requirements set forth in Tennessee Code Annotated section 24-7-123 and that tape could be introduced.

Generally questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere with the exercise of that discretion in the absence of a clear showing of abuse appearing on the face of the record. *State v. McCoy*, 459 S.W.3d 1, 8 (Tenn. 2014) (citations omitted). "A trial court abuses its discretion only when it applies an incorrect legal standard or makes a ruling that is 'illogical or unreasonable and causes an injustice to the party complaining.'" *Id.* However, the

determination of whether the admission of certain evidence violates a defendant's right of confrontation is a is a question of law that we review de novo. *McCoy*, 459 S.W.3d at *8.

In *McCoy*, the Tennessee Supreme Court addressed Tennessee Code annotated section 24-7-123. It held that this code section did not violate the separation of powers. It also found that this evidence, while hearsay, was still admissible. The Court stated:

> The [lower] court ruled that the video recording did not fit within any exception to the general rule of excluding hearsay evidence. We disagree. Although the video recording does not qualify as one of the specifically recognized hearsay exceptions, Tennessee Rule of Evidence 802 provides for admission if allowed "otherwise by law." We have determined that the legislature acted within its constitutional limits by enacting Tennessee Code Annotated section 24-7-123 as a specific and limited exception to the general rule against the admission of hearsay evidence. At the pre-trial evidentiary hearing . . . .the trial court concluded that each of the statutory requirements had been fulfilled by the State. Therefore, the recorded statement, although falling within the definition of hearsay, is admissible under section 24-7-123 as a valid legislative exception to the general rule of excluding hearsay evidence.

*McCoy*, 459 S.W.3d at *12. The trial court finally concluded that, while even admissible hearsay can violate a defendant's right to confrontation, evidence admitted pursuant to this statute does not violate this constitutional provision when the child authenticates the video before it is submitted and is available for cross-examination at trial. *Id.* at *16.

Tennessee Code Annotated section 24-7-123 governs the admissibility at trial of forensic interviews of children. In the code provision disputed by the Defendant in this case, it states that, in order to be admissible, the forensic interview must have been conducted by a person who has "completed a minimum of forty (40) hours of forensic training in interviewing traumatized children." T.C.A. § 24-7-123(b)(3)(D). Additionally, the interviewer must have completed "a minimum of eight (8) hours of interviewing under the supervision of a qualified forensic interviewer of children." T.C.A. § 24-7-123(b)(3)(E).

During the motion hearing, Ms. Brazier testified that she had completed a forty-hour forensic interview training course at the National Child Advocacy Center, and then "shadowed" a forensic interviewer during her internship with Kid's Place, as well as completed an advanced forensic interview training, prior to conducting over 2,000 forensic interviews in her six-year employment period at Kid's Place. Based on her testimony, we conclude that Ms. Brazier was a "qualified forensic interviewer" for the purposes of

Tennessee Code Annotated section 24-7-123. Therefore, we conclude that the trial court did not err when it admitted the forensic interview, and the Defendant is not entitled to plain error review of this issue.

## C. Sufficiency of Evidence

The Defendant does not raise sufficiency of the evidence on appeal. He however does attack B.M.'s credibility. We note that, by its verdict, the jury accredited the victim's testimony despite some inconsistencies on particular details. All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). By its verdict, the jury accredited the victim's testimony. The Defendant is not entitled to relief.

## III. Conclusion

After a thorough review of the record and the applicable law, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE